Marquez versus the Attorney General, Ms. Frost. May it please the Court, the question for this Court today is whether Maria Yanez-Marquez's affidavit makes out a prima facie case that ICE agents egregiously violated her Fourth Amendment rights, her Fifth Amendment rights, and ICE regulations when they entered her home at 5 a.m. on June 30, 2008. And in making that determination about whether she made out a prima facie case, this Court must take the statements in her affidavit as true and must draw inferences from that affidavit in her favor. And if this Court finds that she made out a prima facie case on any one of those issues, then it should remand the case to the immigration judge for a hearing on that question and testimony taken on that question, which did not occur yet here. I'd like to start by talking about the egregious Fourth Amendment violations. In INS versus... You need more than just a constitutional violation, it has to be egregious. For the Fourth Amendment violations, yes, Your Honor. For the Fourth Amendment violations. That is true. And the courts have different definitions of egregious, right? They do. They differ a little bit. So the Second, Third, and Ninth Circuits all have held that egregious violations of the Fourth Amendment require suppressing evidence. The Ninth Circuit said if the violation was in bad faith or intentional, that's enough. The Second and Third Circuits have said it's a totality of the circumstances test. And they've listed a number of factors they take into account. And we don't have a case on it? You do not have a case directly addressing this. This Circuit is... Which one, which side of it do you support? Well, I think we satisfy what is arguably the slightly harder Second and Third Circuit standards. So you... You say you satisfy either one of them? Yes. Exactly. Which one do you sponsor? I'm happy with the Second and Third Circuit test, so I'm happy to promote those here. And I should also note, I won't speak for government's counsel, but their brief, page 25, listed all those factors, noted they'd been cited by the Third Circuit and Oliva Ramos, and I thought seemed to approve of them as the test. We'll see. I don't want to speak for government counsel. But the Second and Third Circuits... We'll ask him the same thing. Of course. Yeah. Evening it out. The Second... I will just note they're listed in his brief as well. The Second and Third Circuit's factors, they're not exhaustive. They're not supposed to... The test isn't limited to these factors. Well, what makes this so egregious? Well, that's... I was... I think... To answer that question... I mean, but what... Without getting into the legal stuff... Sure. Sure. But the facts that... And the factors track the facts, which is one factor is unnecessary and menacing use of force. Here, we have a woman who the door was broken down at 5 a.m. She's five months pregnant, and she tells them wearing a night shirt, and yet they point a gun to her head, not just briefly, but first when they come in after they put her partner in handcuffs, and then later they march her at gunpoint down the stairs. So that's unnecessary and menacing use of force. Well, they've got to protect themselves. Certainly, Your Honor. And I think there's no question that in a situation in which there appeared to be any danger to the officers, then a gun would be necessary. Here, I've cited the Jacobs case in the Seventh Circuit when there's clearly no threat. It is an unlawful use of force to put a gun to someone's head, and then, in this case, they marched her downstairs at gunpoint. This woman was wearing... You say they were there without probable cause? Well, in addition to the problems, there was a number of different problems. One set of problems involves the way in which they conducted the search and the interrogation. The other set of problems was the way in which they entered. So they had a warrant, a judicial warrant. Well, they had a warrant, but the warrant told them to come. They could only... It was a daytime warrant. Exactly, Your Honor. Exactly, Your Honor. Well, what do we make out of that? I think that is a very serious violation, Your Honor. So if you look at the... Well, what's the violation of? The violation is that they entered the home at 5 a.m. when the warrant said very clearly the only times they're permitted to enter was after 6 or before 10. And indeed, as I quoted in my brief, and it's at page 455 of the Joint Appendix, the warrant itself says they can enter in the daytime between 6 a.m. and 10. Well, that's the definition of daytime. The court could issue a nighttime warrant. It could, but if you... But it didn't do it here. But if they did enter at 5 o'clock, the contravention of the specificity of the warrant, what's the impact of that? Does that make it an unwarranted search? Yes, I think that makes it an egregious Fourth Amendment violation. It doesn't... Violating the warrant is not, I don't think, necessarily a constitutional violation. Well, I think... But does it turn it to a... The warrant said 6 to 10, not 6 in the morning to 10 at night. If they came in at 5 a.m., they were outside the terms of the warrant. Exactly. Does that make the search an unwarranted search? Yes. Then you have to... There's a different set of rules for analyzing an unwarranted search. Yes, Your Honor. I think that makes it... But you don't argue that, I don't think. Well, what I argue is... You jump right to saying it's just egregious, egregious, egregious, egregious. Is exclusion called for any time the warrant is untimely executed? No, the question, Your Honor, is whether or not it's an egregious violation of the Fourth Amendment to violate the warrant in that way. And argument is that it is because of the fact that there's this special prohibition against nighttime entry. And the reason is that... And that's exactly why warrants like this have a special... Well, it's a home, too. And homes are given more protection than automobiles. Yes. And so entering at night is considered... So it might be if there was some other technical violation of the warrant, it wouldn't maybe rise to the level of egregious violation. Well, the return says the search was completed somewhere around 8.30. One of the officers, David, said 9.15 was when they left. Okay. But the return would be the best evidence, though. If you looked at the return, y'all didn't put it in the J.A. or the record, nobody knew where it was. Well... But the return says they completed at 8.34 in the morning, completed the search, and it doesn't say when it started. Well, and, Your Honor, that goes back to my point about... They're supposed to make a return to show what they seized and when they did it, give the court a report. So I think that goes to my point about what the standard should be applied here, which I opened with, which is that we're at a stage in which the question is, did she make out a prima facie case of an egregious Fourth Amendment violation, as well as the Fifth Amendment affidavit? There's been no testimony taken. Well, couldn't they have gone in there without a warrant in the middle of the night or 5 o'clock in the morning? That would, I think, also be an egregious violation of the Fourth Amendment, and we're not at... Well, one of the officers made an affidavit that they went in at 6.02. Yes, and, Your Honor... That would make a... That would comply with the terms of the warrant. Certainly, but that is not the posture in which this case comes before you. The immigration judge in this case very clearly said she took all the statements of Ms. Yanez-Marquez as true, and where they conflicted with the ICE officer's affidavit, she assumed Ms. Yanez-Marquez's statements were the correct ones, and, indeed, that is what she had... She doesn't say 5 o'clock. She says approximately 5 o'clock. Yes, she may have... Maybe 6.02 is approximately 5 o'clock. I think the government's brief... The only evidence that's relevant in this case is Ms. Yanez-Marquez's affidavit, where she says they came in at 5 in the morning, not approximately 5 in the morning. Did you make this argument in front of the immigration judge? We certainly did, Your Honor. And that's why she said, I assume... In fact, in her opinion, she said, well, okay, so they came in at 5. I have to believe that to be true, because this is the posture of the case. I'm not holding a hearing. She said 5 o'clock's close enough. She said 5 o'clock's close enough, exactly. That's within an hour. Yes, and my argument is that cannot be right, Your Honor, because, first of all, if 5 o'clock's close enough, then 11 p.m., an hour after the 10 p.m. cutoff, is also close enough. And if we're starting to talk about an 8-hour nighttime prohibition becoming now a 6-hour nighttime prohibition, I would argue that undermines the very purpose of prohibiting these searches at night, which is they are especially shocking, disturbing, upsetting to people to be woken up out of a deep sleep in the middle of a pitch-dark room by someone breaking down their door, which is exactly what occurred here. That is the reason why, in this warrant, in order for there to be a nighttime search permitted, the judge had to find a reasonable cause for that. He did not, which is why he carefully struck out the line that would permit a search anytime at the day or night. Well, they don't issue a nighttime warrant unless the government requests it, and there's some basis for doing it. Warrants are presumptively, I think, daytime warrants. I mean, that's my understanding, anyway. But I didn't see where they acted so bad after they got in there. I mean, I thought they went and got a female officer right there quick, and I thought they treated your client pretty well under the circumstances. They have to be careful, particularly when they're in the nighttime hours. Well, respectfully, I disagree with Your Honor regarding what happened after. So they did get a female officer. That officer pointed a gun at her, and frankly, it doesn't really matter whether it's a man or a woman if they're pointing a gun, which I think was definitely a necessary and menacing use of force. Very similar, by the way, to what the Third Circuit found in Oliva Ramos and the Second Circuit found in its recent Kotzege decision. In addition, they interrogated her for four hours during that period of time. They told her she couldn't use the bathroom. She couldn't put on clothing. They told her she had to sign documents she did not understand. They told her she had to turn over her car keys. To my surprise, the government's brief says that they only briefly detained her. But it's four hours during a period when no reasonable person could have possibly thought they were free to leave. I mean, she'd been told she couldn't use the bathroom. She'd had a gun pointed at her as she walked downstairs. She had no, no reasonable person could have thought that she could leave. So with all due respect, I think what happened to her after the initial breaking into the home was indeed coercive, intimidating, threatening, and led both to the Fourth Amendment violations as well as violations of the Fifth Amendment's standard because those statements were involuntary and coerced. I saw that Judge Hamilton had a question, and I didn't want to. Well, I just want to point out that they didn't go in that house looking for that woman. They went in the house looking for her partner, whoever she was in the bed with. So she was not the target of the search warrant. Yes, which I think is a very important factor here as well. And in fact, the search warrant was because of a criminal case against Robert and Rebecca Bontempo, who owned Annapolis Painting and employed unauthorized immigrants at Annapolis Painting. And no one in this house worked for Annapolis Painting or had anything to do with Annapolis Painting. So even if they hadn't engaged, even if they hadn't violated the terms of the warrant by a full hour, as they did, and even if they hadn't pointed a gun at her unnecessarily and for a lengthy period of time, as they did, then I think if they hadn't done all those things, sure, they could question her about Annapolis Painting, but they didn't stop there. They spent four hours interrogating her during a period that was longer than the period of the search, which adds to the Fourth Amendment violation here, because they didn't search the whole time. As her affidavit shows, they spent a significant amount of time questioning a woman who had nothing to do with the warrant and the affidavit that they had to investigate. I'd like to also talk a little bit here, I think it's definitely overlapping, about the Fifth Amendment violation, the fact that her statements made were involuntary and were coerced. Here, I think it's instructive to look at the Second Circuit's decision in Singh v. Mukasey, where the court suppressed statements made by an individual to Border Patrol officials. They did so because he'd been shaking and crying, he'd been questioned for four to five hours, he'd been threatened, and they felt that, with the fear that he would be deported, and so they felt that his admission that he'd committed immigration violations during that questioning should be suppressed as an involuntary and coerced statement. Here, if you look at the facts, I think they're actually far worse. Unlike Singh, Ms. Yanez-Marcus did not approach voluntarily any immigration officials. She began being questioned after her door was broken down at five in the morning. Here, she was also shaking and crying. She was five months pregnant, wearing a T-shirt. She'd watched her partner be taken off in handcuffs, and as she said in her affidavit, she feared she would be harmed by these officers, officers who pointed a gun at her, who told her she had no choice but to sign documents, even when she told them she didn't understand them. And officers who never told her about any of her rights, the ability not to answer or to seek an attorney to represent her, or that statements could be used against her. Is your argument, are you making a Lopez argument or some other Fifth Amendment argument? I'm sorry, I'm making, so I'm making both arguments, that there was an egregious violation of her Fourth Amendment rights, but also that her Fifth Amendment rights were violated. Now, here, there's an overlap, because the interrogation took place in her home. I think many of the factors that support the egregious Fourth Amendment violations also support the Fifth Amendment violation. Singh v. Mukasey is focused on the Fifth Amendment, because that case took place at a border crossing, so it was not in a home. It didn't implicate the Fourth Amendment in the same way. I'll also point out, before I move off these constitutional violations, obviously it's just persuasive precedent for this Court, but a case, Kotzege v. Holder, was decided the day after our opening brief was submitted, so we talk about it in our reply brief, but I think it's very instructive, and so I just would, I want to flag it for this Court. It also involved entry into a home at 4.30 in the morning, where ICE officers then interrogated an individual, and during the interrogation, he made statements that they used to try to deport him. And... Does your Fifth Amendment argument arise from Lopez's language regarding whether the probative value of the evidence is undermined, or is it something independent and apart from that? Yes. So, when the U.S. Supreme Court, in Lopez-Mendoza, said that egregious violations of the Fourth Amendment, this was a plurality, I should make clear, a plurality, said that egregious violations of the Fourth Amendment could result in suppression of the evidence, they said because either it would undermine the probative value, or it would be fundamentally unfair. I think both could apply here, but certainly fundamentally unfair to use statements made, taken under these conditions. And I think, of course, part of this analysis is deterrence. I mean, if it's acceptable in this case for ICE officers to break into a home an hour before the warrant permits, then, of course, ICE officers know going forward that they don't need to worry about the time limits and warrants. If it's acceptable not to point a gun at a person who poses no threat, to walk that they're going to keep doing that. If it's acceptable to question someone for four hours who has no relationship to the claims in the warrant and the people they're searching, even beyond the period of the search, then ICE officers are going to continue to do that. So I think deterrence, as well as the fact that it's just fundamentally unfair, and the fact that any statements made under that kind of pressure are inherently unreliable. I certainly didn't research this question I'm about to ask, and it may sound somewhat dumb to you. Is this time limitation provided for by the ICE regulations, or is it statutorily created? The time limitation on the warrant? Yes. It is part of the requirements for, it's part of the warrant itself. So on page 14. Well, it's provided for in the criminal rules. In the criminal rules, exactly.  So, thank you, Your Honor. I was going to say. Rule 41. Yeah, and I cite that in my reply brief as well, the rule, criminal rule 41, which limits the ability to grant a warrant to do a nighttime search and requires there be a special finding there. So I'd like to talk briefly. The violation of the search warrant rule is not, rule 41, is not necessarily a constitutional violation, for sure. I would agree that violations of a warrant are not always. I was trying to spell out what I thought you'd want to cabbage on to. If it said search between 6 in the morning and 10 at night, you're authorized to search. That's a court order issued by the United States magistrate judge up there in Baltimore. And then, if you go in, in that other eight hour span, you don't have a warrant. Yes. I would think that's what you'd argue. It's an unwarranted search. Yes. I would go back and start all over again. Are they entitled to go in a house in the middle of the night without a warrant? Well, Your Honor, I'm sorry. But you didn't pick up on that and you didn't even brief it. I don't know. Maybe you waived it. I don't think I would. Well, Your Honor, I wouldn't. If there's anything that ought to be deterred, it's ICE officers out going in homes in the middle of the night without warrants. That ought to be deterred. Well, I certainly do. But if, but if there had some reason, maybe there was some fear or something. I don't know. Maybe they knew that there were some people in there with some guns and they wanted to go in there. But then maybe they should have gone back to the magistrate. I don't know. But you say we have to accept the 5 o'clock in the morning and that puts it an hour before they were authorized to go. Yes. And they can read and write when they're trained on these warrants and it's a federal court warrant. Yes. Well, Your Honor, if I... And they don't put it on the return, which the IJ didn't know about and you all didn't know about. Nobody tried to find a return to see when they searched. If I may just briefly address the point about waiver. I agree with that argument. I think that's one of many good reasons to think this was an egregious Fourth Amendment violation. I think we did make that argument because we said this... But it's not necessarily a Fourth Amendment violation at all. It's a violation of Rule 41, arguably. Okay. Well, I would like to think, because the understanding, my understanding about appellate arguments is that you're supposed to raise every claim and that sub-arguments within claims don't always have to be perfectly articulated. We did talk about Rule 41 being violated here. We talked about the warrant being violated. Did the IJ say anything about the agent's conduct being intentional or perhaps negligent? The IJ did not address the question of whether the agents were negligent. Her response to our argument that this was a search at 5 a.m. was to say an hour is not a big difference. To come in at 5 is not a big difference from coming in at 6. And that, of course, we take great issue with. I see that my time is up. It is. We'll agree with that. Mr. Robbins? May it please the Court, Jonathan Robbins here on behalf of Eric Holder, the Respondent, the Attorney General. Good morning. The critical issue in this case is whether or not the Board abused its discretion in upholding the immigration judge's denial of Petitioner's motion to suppress the evidence in this case. And the evidence that they're looking to suppress in this case are the statements made by Petitioner during the course of ICE's enforcement action, in which she admitted that she wasn't legally in the United States, and also the I-213 record of deportation, which is essentially a summary by the agents that they had interviewed her and that she had admitted that she wasn't legally in the United States. And it was this evidence that resulted in a finding that she was removable from the United States. And you got that because you went into the House and searched? Correct, yes. You got that evidence. Was there any evidence seized from the House that you used against her? You talked about the statements. The statements, yes. Was there anything seized in the course of the search that was used against her? Not that it was used against her. What was used against her were her words. Correct, and the report from the officers, yes. So now, her affidavit does say that certain documents were seized, but there's no return of warrant or inventory in the record. Well, there is an inventory in the record. There's a return, and it specifies what they took. There is a return. I didn't see the return in the record. I saw the search warrant. Well, it's not, you don't have it in your administrative record. It's in the court record. Oh, okay, I see. It's in the court record. You have to make a return on a warrant. You have to report back to the court, the officers do, what they did with the blame warrant when they got it. Yes. They report issues of warrant. It's a command to go and search. They have to comply with it. They go and search, then they report back, supposedly, when they executed the warrant and what they took, what the results were. Yes. That's the inventory, it's called. Yes, but my point is, it's not in this administrative record for this case. That's right. It's not in this administrative record, because you all didn't put it in there. Well, that would be something, if Petitioner had established- We can take judicial notice of what the search warrant was. Respectfully, Your Honor, I disagree with that. First of all- You don't think we can take judicial notices of the return? No. That is something that would come into evidence if Petitioner had established a prima facie case of illegality. That's a funny position for the government to take. We can't take judicial notice of a court record that relates specifically to this case. Well, respectfully, Your Honor, the statute specifically says, under 8 U.S.C. 1252b, that the court may only consider this case with respect to the administrative record. Now, if the return would come into play if Petitioner, if the court finds that Petitioner established a- I'm not saying it's that relevant, except the 5 o'clock, anyway, but I think we can take judicial notice of things. My point is that it's not in the record yet. If Petitioner were to have established a prima facie case that the evidence was acquired illegally, then it would go back for a hearing, and at that point, then the return of record could be submitted. Well, you didn't put it in the record. DHS did. Pardon? DHS. ICE. DHS. Well, then you didn't put it all, because the return is part of it. The return is part of it. Well- You turn it over on the back, and part of it. That's evidence that could have been submitted had the case gone to a hearing. Well, but you didn't put it all in. Are you sure? You presented an incomplete record. We had to go dig it out and get it from the clerk's office. But my point is, the proceedings hadn't gotten to that point yet. First, Petitioner has to establish a prima facie case that the evidence was acquired illegally. Then DHS can submit evidence such as the return, which could rebut their claim that they went in at 5 o'clock. That would come in later on, and that's my point. The return still could come in if the court were to determine that she did establish a prima facie case that the evidence was acquired illegally, then when it went back to a hearing, then the return of record could be submitted as evidence. But it wasn't in this case. It didn't get to that point because she didn't establish a prima facie case that the evidence was acquired illegally. Now, I know Petitioner has spoken at length about- Why did they go in at 5 o'clock? Well, that hasn't been determined yet. Again, Your Honor, we assume, of course, for the sake of argument, which the immigration judge did correctly, that her claim that they went in about 5 o'clock is true for the purposes of this analysis. It hasn't been determined yet whether that's actually true. But in this analysis- Well, for the purpose of this case, you say it's true. Yes, correct. For the purpose of this appeal, it's true they went in at 5 o'clock. There's no explanation been offered as to why they went in at 5 o'clock. Well, the question- We'd have to remand to get further evidence as to why they went an hour before the warrant authorized them to go. No. What's relevant here is whether or not this would constitute an egregious violation. If it doesn't constitute an egregious violation, then there's no need to remand because even- If the warrant says go between 6 and 10, and they went at 5, they went without a warrant. Well, that's not what they- So what's the law on going in a house without a warrant at 5 o'clock in the morning? Well, they haven't contended that this was a warrantless arrest. They just simply say that violating the terms of the warrant- I don't think anybody said that she'd be just detained. But they went in and searched the house. Yes. What's the law on having an unwarranted search of a home at night? Well, the Supreme Court has held that the exclusionary rule still doesn't apply in civil removal proceedings. It hasn't said that the exclusionary rule should apply even if it was a warrantless search. In fact, the agency regulations specifically allow warrantless arrests and other various- I mean, first of all, the agency could issue administrative warrants. This was an unusual case in that they got a judicially issued bench warrant. But the agency doesn't have to get a warrant. So that would- They didn't have to go into a home? I think probably in the event of a home enforcement action, I think they would have to at least have an administrative warrant, but I'm not 100% sure on that. But here they chose to go to the judge. They went to the U.S. Magistrate Judge. Yes, this was part of a larger operation. They were investigating- They got separate warrants, and this was one of them. Yes. But then they executed it at a time. They executed it at night, but they most executed it at daytime. Yes. And the question before the court then is, does jumping the gun on the time in the warrant constitute an egregious constitutional violation? Now, Your Honor pointed out that we don't even know that this is- I don't know if that's the issue or not. Well, that's certainly the issue.  That's what the board found, and that's what they've argued. So maybe the board missed it. Maybe the board and the IJ missed it. That's not what they've argued in their brief. They've gone along with this argument, and they've contended that it's an egregious violation of the Constitution. You say that neither the IJ nor the board had to return, so they didn't even have the thing. They didn't even have the court record. But the question is whether there's a something- is there a factor in the record alleged by Petitioner in her affidavit or in the evidence that was presented that renders their enforcement action occurring at 5 o'clock, is there something that renders that egregious over what they- Well, they've done it at 6 o'clock within the terms of the warrant. That's the relevant analysis. And they haven't identified any factors that would render- You're assuming it's a warranted search at 5 o'clock. Well, that's what the agency- Well, it's not a warranted search at 5 o'clock because the warrant says don't go in until 6 o'clock. Well- So you don't have authority to go in the house until 6 o'clock on the face of it. So how do you deal with that? I mean, your officers violated a court order to go in the house at 5 o'clock. Now one of them said in an affidavit we didn't go until 6 o'clock. I mean, maybe your I.J. could find that he's the one that's credible and it was really a warranted search at 6 o'clock. But you accepted for purposes of this ruling that they went in at 5 o'clock, which was It would have to be intentional because the officers certainly went in and got the warrant and they could read and write and probably have training on federal search warrants and how to get them and how to execute them. The notion that this wasn't- And how to make returns of them. The notion that jumping the time on the warrant made this no longer a valid warrant wasn't an issue that was raised. The agency didn't find that. They didn't argue that. The argument that was made was that this was constituted an egregious constitutional violation. Now I understand, Your Honor, maybe- That would have to be subsumed. That'd have to be a- well, go ahead. And so all we can go on is what the agency specifically found in this case. And this is the argument that they've conceded. They haven't contended that this wasn't a warrantless arrest. And I might add that the Supreme Court's decision in Inez against Lopez Mendoza still precludes the exclusionary rule even in cases that don't include warrants anyway. So the application of the- the analysis regarding the application of the exclusionary rule wouldn't apply in this case, regardless of whether it was a valid warrant or not. So that distinction really doesn't have relevance with respect to this particular analysis. The ICE can search- go into homes at five o'clock in the morning and search them and not have to worry about the exclusionary rule. No, I think they would- Well, that's just what- They would have to worry about their conduct. But the exclusionary rule doesn't apply. No, I think each case is looked at in a case-by-case analysis. And they would certainly have to look at their conduct. If their conduct amounted to an egregious violation, there are some circumstances where that might be possible. But in this case, that didn't happen. Again, petitioner hasn't alleged any specific factors that would render going in on an enforcement action at five o'clock so vastly different from six o'clock that there was some sort of egregious thing here. What they've said in their brief is that there's a special trauma that goes along with the pre-dawn raid. But that doesn't allege any actual egregious factors that would render this egregious. In fact, six o'clock on the warrant- within the terms of the warrant, as Your Honor has mentioned, that could technically be pre-dawn depending on what time of year it is. I mean, sunrise can go, I think, as late as 7 p.m. But the rule defines daytime. Yes. We're not talking about when the sun's up. Right. But I'm talking about- The rule defines what the daytime is and what nighttime is. Yes. Well, I agree with you. Yes. The federal rules specifically have that time. It goes by time rather than whether the sun's up. Yes. But the point that I'm making is they're arguing that there's a special trauma that comes with a pre-dawn raid. And that seems to imply two separate things. They're either saying, well, it was dark outside, so that's made it extra scary and that makes this egregious. Or they're saying that, well, that appears to be what they're saying. And the point that the immigration judge made in determining this wasn't egregious, there were no factors that rendered this egregious, is that there wasn't really a fundamental difference between going in at 5- being woken up at 5 a.m. or being woken up at 6 a.m. That's what- Right. He didn't catch the fact that it was a- that it was no warrant for going in at 5 o'clock. There was a warrant to go in at 6 o'clock. Well, regardless of whether it was a valid warrant or not, it's irrelevant in terms of the exclusionary- Well, it's not irrelevant, I wouldn't think. If it's- if you go in without a warrant in a house, you've got a lot better argument about a constitutional violation than if they- if a warranted search is- we encourage officers to get warrants all the time. Most of the time we have problems when they don't get warrants. Whether- Here they got one, but then they didn't execute it. Whether it's a constitutional violation is irrelevant. What matters here is whether it's an egregious violation. The board didn't- It's got to have a violation first. No, you have a violation- Even if we were to- And then you decide whether it's egregious. Well, even if we were to- You can have a violation that's not egregious, that's right. That's what I'm trying to get you to explain to me why- if there is a violation that's not egregious. An unwarranted search of a house probably, presumptively, a violation at night, but maybe you- If we were to- Maybe you or the IJ could explain why it wouldn't be egregious. If we were to assume that it is a constitutional violation to go before the terms of the warrant, which the board didn't find, I would just reiterate, but if it were to be assumed that it was, again, what are the factors that they've alleged that make this egregious? All they've said is that there's a special trauma that goes with a pre-dawn raid. Well, six o'clock could be pre-dawn, depending on what time of year it is. That doesn't, in itself, specify any factor that would render this particular action egregious, and that's what the relevant analysis is here. They've also said that there were egregious violations because of the use of unreasonable force. Now, it's well established in the case law here that the officers, when they're conducting this type of enforcement action, have the authority to secure the situation. It's for occupant safety, for officer safety. All of their actions in this case were reasonable with respect to ensuring that safety. You know, they mentioned that they had guns pointed at them, but they don't allege that there was any gun pointing or any shouting once they had been secured in the living room, which is consistent with the purpose of trying to secure the premises, making sure there's nobody hiding in a room with a weapon or anything of that nature, and their conduct was reasonable and responsible in that regard. You know, there's this surprise that the officers encountered when they encountered a woman who was five months pregnant, and they did exactly what we would want ICE officers to do in this situation. They immediately called a female officer to come assist her. The female officer told her it was going to be okay. They let her get a shirt to cover the nightshirt that she'd been wearing. I know that they had claimed that they weren't allowed to go to the bathroom, but it's important to note that the time that she asked them to go to the bathroom, they were still conducting their protective sweep, and that is reasonable to not let anybody just go roaming through the house while they're busy clearing the different rooms. Now, there's no allegation in this affidavit that she provided that she continually asked or that she was repeatedly denied an opportunity to go to the bathroom. There's only this one instance where she asked while they were still conducting their sweep, so that certainly is reasonable conduct, and I think Your Honors have noted that they certainly have a right to protect themselves and to ensure that safety. That's very consistent with case law. All the case laws proved resounding in that regard. With respect to the petitioner's argument regarding the actual warrant itself being particularized, the warrant itself has a picture of the house. It has the address of the house. It specifically authorizes the government to look for illegal aliens, and the Supreme Court law is also clear that the officers may ask immigration status when they're conducting this enforcement operation, the Supreme Court's decision in May 19th. They can ask for immigration status without giving somebody their warrant, right? I'm sorry, what did you say? That's your proposition? They can ask who – what's your immigration status without – they don't have to give Miranda warnings just because they find somebody in a house where they're asking for a search warrant. No. In fact, the regulations don't require a warrant at all. They say – the regulations require a reasonable suspicion that somebody is in the United States – The regulations that get you – would enable officers to go in there without a warrant? The regulations allow for warrantless arrests. For – in a home at night? I don't think they specify in a home at night. That would be something that would go into case law. Well, that's what we've got here. And as far as – They argue about regulations. I thought the regulations were just to keep the officers straight and the ICE straight. I didn't know that created any rights in the petitioner. Well, the board has – But you violate the regulations. The board has actually spoken a little bit to – The partners? The board has actually spoken a little bit as to the standard that we look at when we're looking at whether evidence should be suppressed, and what they've held is that suppression of the evidence – This is in matter of Toro, which is cited to in the immigration judge's decision. What they've talked about is that the evidence might be suppressed – suppressible if the evidence – if usage of the evidence would transgress notions of fundamental fairness or undermine the probative value of the evidence. And that would seem to include egregious violations within its scope. I think it actually covers a range of conduct that's actually broader than simply – than the hard standard of egregious violations. Well, you've got a regulation, 8 CFR 287.12, that says these regulations do not and are not intended, shall not be construed to, and may not be relied upon to create any rights substantive or procedural, enforceable at law by any party in any manner, civil or criminal. That's a regulation that exists. Yes. So a violation of the regulation doesn't necessarily create any rights. Correct. And, again, there's actually a lot of overlap. The Supreme Court in Lopez Mendoza said we're not addressing whether the board violated its regulations. So their argument – they've sort of taken a spaghetti-against-the-wall approach. They've said, oh, well, the agency's violated five different regulations here. They're trying to bootstrap onto that possible exception to the fact that the court doesn't apply the exclusionary rule. But there's a lot of overlap with respect to the analysis because the regulations that they're challenging, that they say – that they claim that the agency violated, involve the same issues – you know, the use of force or whether or not they were arrested, you I see I'm running a little bit out of time here. I just want to briefly focus on – there's another argument that's being made with respect to that advice of counsel. The board has a precedent decision interpreting its regulation in this regard. The requirement of advice to counsel doesn't happen until an alien's been placed in formal proceedings, which is practically at the time when the NTA is issued. The Supreme – I mean, the board, rather, has a precedential decision to that effect, and their interpretation of the regulation in that regard should be afforded deference. And that's actually deference as set forth in our against Robbins, which is an even greater level of deference than that of Chevron deference. What? The board's – you've amended Miranda? I'm sorry, what? Have they amended Miranda? You've amended Miranda to that extent? Well, there's no Miranda rights in civil proceedings. Well, they arrest them, don't they, as they – The regulations require that the alien be advised – No, but Miranda says when you arrest somebody, you've got to give them rights. Well, not according to the regulation. Under the regulation – I know. I know. The regulations, that's what it says. Yes. This is different. It's an exception. Yes. I'm not arguing with you. Okay, okay. I'm trying to understand it. Okay. Did Your Honor have a question? I saw you raise your hand, I think, a moment, but I don't know if you're still questioning. I just want to make sure I understand. If there's a violation of Rule 41, that doesn't transcend into a violation of the Constitution, does it? This goes as to the time of search. I don't think it does, but again, I want to be careful. The board and immigration judge didn't make a finding in that regard, and I don't want to go making some argument that the board and immigration judge didn't make. I think the answer is clearly no. It doesn't. I mean, I don't think so either, but again, I don't want to make an argument that the board and immigration judge didn't make. What's before the court are the findings of the board and immigration judge, and the record is limited to those findings. And their interpretation was that this wasn't an egregious violation, and it was limited to that. Again, they haven't argued anything regarding the scope of Rule 41 with respect to the actual application of the federal rules setting forth that timeframe of date time. I'm trying to think. So I guess if there are any other questions with respect to the fourth, fifth amendment rights or the regulations, I'll be happy to answer them. Otherwise, I'd simply thank the courts for their time and uphold the decision of the board and immigration judge. You'd say we should deny the petition. That's what your request is. Yes. Oh, there is one further thing. We're out of time. Oh, sorry. Go ahead. Just very briefly, the request, the remedy that they were asking was termination of proceedings, I believe. That's not the appropriate remedy. The appropriate remedy would be to send it back down for a hearing on the issue. They'd want to remand, and you want to deny the petition. Correct. Thank you very much for your time, Your Honors. Ms. Frost? Thank you, Your Honor. Just briefly on the question of whether we raise the points being argued here about whether or not the violation of the terms of the warrant by entering an hour earlier, whether that I'll just point, Your Honors, I do think that Your Honor is making the argument more clearly than we made in our brief, but I think it's subsumed within the arguments we made in our brief. If you look at page 36 of our brief, the heading is, ICE officers entered Ms. Yanez-Marquez's home at night in violation of the express terms of the warrant. And then we explained how that is an egregious Fourth Amendment violation, in part because yes, entering at night is itself a reason to think that there's an egregious violation. But in addition, and we made this point, because intentional violations of the warrant are intentional violations of the Fourth Amendment, are themselves reasons to find an egregious violation. But you told me earlier that the immigration judge didn't address whether or not their conduct was intentional, or for that matter reckless. How do we know? Well, she did say that they entered at 5, and I think that, I have two answers to that. One, Your Honor, I would say the fact that they entered at 5, which is what has to be assumed is true, and she assumed is true, I also assume they're adults who can tell time. That was an intentional act on their part. The second point would be, that might be another issue to be explored on remand. I mean, our position here is that what the right result here is remand to the immigration judge for a hearing on these questions. And at a hearing, there would be an opportunity for ICE officers to present testimony, and there would be an opportunity for Ms. Yanez-Marcus to cross-examine them and to present her own testimony. She's been denied that opportunity on the ground that she didn't even make out a prima facie case. So, did that answer Your Honor's concern there? I also wanted to talk briefly about the regulations. It is not correct, I don't think, Your Honor, that Judge Floyd, that the regulations are just guidance that don't need to be followed. I quoted it verbatim from the CFR. Well, so I was going to point, Your Honor, to, and this is cited in our briefs, it's a matter of Garcia-Flores. It's a BIA decision from 1980, where the BIA says, when there's a violation of a rule or regulation promulgated at least in part to bestow a procedural or substantive benefit on the individual in question, then that is a reason to invalidate agency action. There needs to be prejudice shown, so that we explain in our brief why she's prejudiced. But in matter of Garcia-Flores, the BIA decision, the BIA goes on to say, where compliance with the regulation is mandated by the Constitution, prejudice may be presumed. Similarly, where an entire procedural framework designed to ensure the fair processing of an action affecting an individual is created but then not followed by the agency, it can be deemed prejudicial. So this is the BIA's own precedent. I didn't think the government actually took issue with, they of course argue their regulations weren't violated. But I didn't even understand their brief to argue that if the regulation, if we could show they were violated and that there was prejudice, that that's a reason for terminating the proceedings. That's why we ask for that remedy. And this is the Accardi Doctrine, the Supreme Court announced in Accardi in another immigration case. Well, there's a lot of precedent like in the Ninth, Fifth, and First Circuit that says the regulation bars the claims you allege. In those circuits, it says. Well, this court in United States, sorry, let me get this citation for you. In Morgan, let me see if I can quickly get to it, the Fourth Circuit also said that violation, it was in the Bureau of Prisons context, so maybe you would think that's not relevant. But it also said violations of regulations are themselves grounds for terminating agency action. You have to show that the regulation that was violated was, that it prejudiced, you first have to show it was violated and you have to show it prejudiced the individual. And here we're talking about regulations governing unnecessary use of force. And remarkably, ICE regulations are very clear, they're supposed to use minimal amounts of force. So for that reason alone, the pointing of the gun at her I think violates the regulation as well as the Fourth Amendment. ICE regulations also require advising immigrants or individuals who are being questioned by ICE officers about their rights, including the fact that statements they make may be used against them and that they can obtain counsel. Now, the position of the government is that that regulation doesn't kick in, doesn't apply until someone gets a notice to appear in the mail. That is long after they've been questioned by an examining officer. As I explained in my open brief and in more detail in my reply, I don't think the regulation can reasonably be read to do that. Because the regulation refers to an examining officer advising the individual they're questioning about the reasons for the arrest, about the fact that statements they made may be used against them. It makes... The red light is on. Okay. Just to conclude, I think it makes no sense to read that regulation not to apply. Thank you, Your Honors. Thank you. We'll come down and greet counsel and adjourn the recess court until tomorrow morning at 9 o'clock. This honorable court stands adjourned until tomorrow morning at 9 o'clock. God save the United States and this honorable court.
judges: Robert B. King, Henry F. Floyd, Clyde H. Hamilton